## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN MCKEAN and MICHELE
MCKEAN,

      Plaintiffs,

      v.

NATIONWIDE INSURANCE COMPANY,

      Defendant.

Docket No.: 3:12-cv-01206-RDM

**JURY TRIAL DEMANDED**

---

### PLAINTIFFS' MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANT'S "MOTION IN LIMINE
### TO EXCLUDE PLAINTIFFS' EXPERT WITNESSES"

Jeffrey P. Resnick
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: jresnick@shermansilverstein.com

*Attorneys for Plaintiffs Stephen McKean and
Michele McKean*

## **TABLE OF CONTENTS**

Table of Contents ................................................................................................ i

Table of Authorities ............................................................................................ii

Introduction ...................................................................................................... 1

Counter-Statement of Facts ............................................................................... 4

Counter-Statement of Question Presented ........................................................11

Legal Argument ............................................................................................... 12

      1.     NFPA 921, Which Mr. Ebersole Relied Upon in Reaching His Conclusions, is Reliable as a Matter of Law ........................................................... 12

      2.     Mr. Myers' Opinions are Equally Reliable .........................................17

Conclusion ...................................................................................................... 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

Booth v. Black & Decker, Inc., 166 F. Supp. 2d 215 (E.D.Pa. 2001) ...........................................3

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) ........................................... 12, 13

Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005) ...........................3

Hoang v. Funai Corp., 652 F. Supp. 2d 564 (M.D.Pa. 2009) .....................................................2, 13

Keller v. Feasterville Family Health Care Ctr., 557 F. Supp. 2d 671 (E.D.Pa. 2008) .................12

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) .................................................................. 12

McCoy v. Whirlpool Corp., 214 F.R.D. 646 (D. Kan. 2003) ........................................................ 3

Saitta v. Franklin Development Co., Docket No. A-2466-06T1, 2009 N.J. Super. Unpub. LEXIS 241 (N.J. Super. App. February 13, 2009) ...............................................................16, 17

Schneider v. Fried, 320 F.3d 396, 401 (3d Cir. 2003) ................................................................ 12

United States v. Hebshie, 754 F. Supp. 2d 89 (D.Mass. 2010) .................................................2, 13

## STATE CASES

Erie Ins. Exchange v. Transamerica Ins. Co., 533 A.2d 1363 (Pa. 1987) ......................................2

Ruttenberg v. Fire Ass'n of Philadelphia, 186 A. 194 (Pa. Super. 1936) ......................................2

## FEDERAL RULES

Federal Rule of Evidence 702 ........................................................................................... *passim*

Federal Rule of Evidence 703 ........................................................................................... 18

## INTRODUCTION

Stephen McKean and Michele McKean (collectively, "Plaintiffs"), by and through their counsel, Jeffrey P. Resnick of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., respectfully submit this memorandum of law in opposition to the "Motion in Limine to Exclude Plaintiffs' Expert Witnesses" ("Motion to Exclude") filed on behalf of Defendant Nationwide Insurance Company ("Nationwide"). Nationwide's Motion to Exclude should be denied.

On September 22, 2011, a fire occurred at the Plaintiffs' residence at 803 Raymondskill Road in Milford, Pennsylvania ("Residence"). It is undisputed that, at the time of the fire, the Plaintiffs' interest in the property and its contents was insured under a homeowner's policy issued by Nationwide ("Policy"). Russel Andress of the Pennsylvania State Police was called to the Residence by local authorities, and arrived at around 10:30 p.m. From the very beginning, Mr. Andress was inclined to believe that the fire was an arson, due to unproven suspicions he had about a prior fire. After spending less than forty minutes investigating the fire scene using a flashlight, he concluded that there were five separate points of origin (including a couch on which a ceiling fan had fallen), and the fire was intentionally set.

Subsequently, Nationwide retained the services of a fire investigator, Thomas Jones, who parroted Mr. Andress' hasty conclusion that there were five points of origin. Mr. Jones acknowledged that a ceiling fan had fallen on the couch, but summarily dismissed the possibility that the couch was the sole origin of the fire, and the ceiling fan its cause.

The Plaintiffs commenced this action on June 25, 2012. On January 11, 2013, Nationwide filed its Answer with Affirmative Defenses. Therein, Nationwide alleged that the fire was intentionally set by Mr. McKean and the loss is therefore excluded from coverage.[1]

---

[1] See Docket No. 20, ¶ 30.

Nationwide bears the burden of proving this affirmative defense.[2]  Indeed, this is not a third-party products liability case against a manufacturer where the plaintiff bears the burden of proving a defect.  Rather, this is a first-party insurance coverage case where the insurer bears the burden of proving the applicability of the arson exclusion.

The Plaintiffs have furnished expert reports authored by Daryl L. Ebersole, P.E. of Robson Forensic, Inc. ("Ebersole Report" and "Supplemental Ebersole Report"), as well as a report authored by Joseph E. Myers, Sr., CFI ("Myers Report").  Both Mr. Ebersole and Mr. Myers concluded that the sole origin of the fire was the couch on which the ceiling fan had fallen.  Mr. Ebersole, after thoroughly examining the ceiling fan, further concluded that the cause of the fire is undetermined, and the ceiling fan that fell onto the couch cannot be ruled out as the cause.[3]  Mr. Myers reached a similar conclusion.

Nationwide would have this Court think that these conclusions are somehow "unscientific."  Nothing could be further from the truth.  In reaching their conclusions, Messrs. Ebersole and Myers expressly applied the methodology set forth in NFPA 921, the universally accepted standard for investigating the origin and cause of a fire.  Case law is clear that NFPA 921's methodology is reliable for the purposes of Federal Rule of Evidence 702.[4]  In fact, it is the

---

[2] See, e.g., Erie Ins. Exchange v. Transamerica Ins. Co., 533 A.2d 1363, 1366 (Pa. 1987); Ruttenberg v. Fire Ass'n of Philadelphia, 186 A. 194, 195 (Pa. Super. 1936) ("The sole issue for the jury was whether the insured burned, or caused to be burned, the building and its contents in such manner as to void the policies.  The defense that the fire was caused directly or indirectly by the insured was an affirmative one, and the burden was therefore on the defendants to prove that the fire was set, or was caused to be set, by the insured.").

[3] See Ebersole Report, a true and correct copy of which is attached as **Exhibit "A"**; Supplemental Ebersole Report, a true and correct copy of which is attached as **Exhibit "B"**; Myers Report, a true and correct copy of which is attached as **Exhibit "C."**

[4] See, e.g., United States v. Hebshie, 754 F. Supp. 2d 89, 109 n.39 (D.Mass. 2010) ("NFPA 921 is promulgated by the Technical Committee of the National Fire Protection Association ... , the largest fire protection organization in the world and is widely accepted as the standard guide in the field of fire investigation."); Hoang v. Funai Corp., 652 F. Supp. 2d 564, 567 (M.D.Pa. 2009) ("Several courts, including this one, have recognized that NFPA 921

"gold standard."[5]   NFPA 921, § 19.2.1.4 – which Nationwide simply ignores in its briefing –
provides that "[w]henever the cause cannot be proven to an acceptable level of certainty, the
proper classification is undetermined."[6]

By virtue of its Motion to Exclude, Nationwide attempts to serve as both judge and jury
in this case.  It possesses neither role.  The Motion to Exclude should be denied.

---

offers a comprehensive and detailed treatment for fire investigation and have held its
methodology is reliable for purposes of Rule 702."); Booth v. Black & Decker, Inc., 166 F.
Supp. 2d 215, 220 (E.D.Pa. 2001) (recognizing "NFPA 921's comprehensive and detailed
treatment of fire investigations" as authoritative); accord Fireman's Fund Ins. Co. v. Canon
U.S.A., Inc., 394 F.3d 1054, 1057-58 (8th Cir. 2005) ("This guide qualifies as a reliable method
endorsed by a professional organization.").
   [5] See McCoy v. Whirlpool Corp., 214 F.R.D. 646, 653 (D. Kan. 2003), rev'd on other
grounds, 258 Fed. Appx. 189 (10th Cir. 2007).
   [6] See Exhibit A, page 30.

## COUNTER-STATEMENT OF FACTS

### I.

Russel Andress of the Pennsylvania State Police arrived at the Residence at around 10:30 p.m. on September 22, 2011.[7]  He has no engineering degree, has never studied engineering, and is not an expert on electrical fires.[8]  Mr. Andress was inclined to believe that the fire was an arson, due to unproven suspicions he had about a prior fire.[9]  Mr. Andress examined the scene using a flashlight and concluded, after just forty minutes, that the fire had five points of origin and was of incendiary origin.[10]  In his view, the five points of origin were (1) a stack of papers on an island in the kitchen; (2) "a linen-type cloth next to the interior wall which separates the kitchen from the living room"; (3) a couch; (4) a love seat; and (5) a recliner.[11]

Daryl Ebersole is a Professional Engineer and Certified Fire and Explosion Investigator. Mr. Ebersole received his bachelor's degree in electrical engineering from Drexel University, and has attended nearly thirty continuing education courses.   He is a member of numerous professional organizations, including the National Association of Fire Investigators, the National Fire Protection Association, and the Pennsylvania Association of Arson Investigators.[12]

Mr. Ebersole began his analysis by refuting Mr. Andress' unfounded and "mislead[ing]" suggestion that there was an "interior wall" separating the kitchen from the living room:

> There is no interior wall to separate the kitchen from the living room.  The kitchen, living room, and dining room on the first floor are all one open space with stairways ascending to the second floor.  All of the five separate origins that he identifies are within

---

[7] See Exhibit B, page 2.

[8] See Deposition of Russel Andress (excerpts), a true and correct copy of which is attached as **Exhibit "D,"** 9:4-12:7.

[9] See Exhibit D, 100:5-101:3.

[10] See Exhibit B, pages 2-3, 11.

[11] See Exhibit B, page 3.

[12] See Curriculum Vitae of Daryl L. Ebersole, P.E., a true and correct copy of which is attached as **Exhibit "E."**

this open space where there is nothing to inhibit flying brands, heat, hot gases, and drop down burning debris from migrating through the space.[13]

Mr. Ebersole proceeded to cite NFPA 921, § 22.2.1.2:

Separate fires that are not caused by multiple deliberate ignitions can result from the following:

(1)    Fire spread by conduction, convention, or radiation
(2)    Fire spread by flying brands
(3)    Fire spread by direct flame impingement
(4)    Fire spread by falling flaming materials (i.e., drop down) such as curtains
(5)    Fire spread through shafts, such as pipe chases or air conditioning ducts
(6)    Fire spread within wall or floor cavities within "balloon construction"
(7)    Overloaded electrical wiring
(8)    Utility system failures
(9)    Lightning[14]

Mr. Ebersole further cited numerous sections of NFPA 921 that explain that fire spread can occur as a result of "drop down," which occurs "when a flaming material drops down and ignites combustibles that it falls on or near."   His report makes clear:

The couch, love seat, and recliner were all arranged around the living area where the ceiling fan/light was located. ... There were no walls or partitions separating the five origins that Mr. Andress identified.  The heavily burned furniture caused hot gases to rise and circulate through the compartment that included the kitchen, living, and dining areas.  The markings on the wall above the burned rag or towel show that movement was occurring from the area of the burning living room furniture toward the kitchen area. Burning debris would be expected to be carried from the burning furniture and drop down onto other things including other furniture, wall hangings, and loose papers.  The locations where burning debris falls can result in them igniting remote fuels which can appear to be different origins.[15]

---

[13] See Exhibit B, pages 11, 12, 19, 21.
[14] See Exhibit B, pages 21-22.
[15] See Exhibit B, pages 11, 19, 21.

Mr. Ebersole pointed out that Mr. Andress reached his opinion regarding five separate fires without "performing a through inspection of the ceiling light/fan."  Mr. Ebersole pointed out that a fire investigator cannot draw a conclusion about the cause of the fire until "a thorough investigation has been completed."  Mr. Ebersole opined that Mr. Andress failed to perform a through investigation, used "subjective opinions to support an incendiary cause determination in the absence of physical evidence," contrary to NFPA 921, § 22.2.8.2, and substituted his belief about "the 'motive' or opportunity for the fire" in place of "a properly conducted investigation and determination of the fire's origin and cause," contrary to NFPA 921, § 22.4.1.1.[16]

Mr. Ebersole ultimately concluded that Mr. Andress' "theory concluding that there are multiple origins within the open space of the living, kitchen, and dining areas is contradictory to NFPA 921," and "[t]he presence of burned paper on the kitchen counter, the charred rag or towel, and the nearby furniture are all consistent with being [the] outgrowth of a fire that originated at a single location in the living area."[17]

## II.

As previously stated, Thomas Jones issued a report on behalf of Nationwide on October 10, 2011 ("Jones Report").[18]  Mr. Jones essentially parroted Mr. Andress' conclusion that there were five points of origin.  Mr. Jones did acknowledge that, in investigating the fire, he determined that the ceiling fan that hung above the couch had fallen on the couch, but summarily eliminated the fan as the cause of the fire.[19]

On December 10, 2012, Mr. Ebersole conducted a thorough inspection of the ceiling fan, with Mr. Jones also present.  At the outset, the pieces of the fan were oriented to resemble, as

---

[16] See Exhibit B, pages 23-24.
[17] See Exhibit B, page 22.
[18] See Jones Report, a true and correct copy of which is attached as **Exhibit "F."**
[19] See Exhibit F.

closely as possible, an assembled ceiling fan. Mr. Ebersole discovered evidence of melted and resolidified metal in the area of the lamp holders.[20] Mr. Ebersole further discovered evidence of melted and resolidified copper wiring inside of the switch housing (which Mr. Jones had not previously opened); further, when the motor housing was opened and the motor windings were exposed, melted materials were seen.[21]

Mr. Ebersole further observed that the heaviest burning occurred in the area of the living room in the space that included the ceiling fan and the sofa, and there was less burning as the distance from this area increased. He concluded that the origin of the fire was the living room in the area of the ceiling fan and the sofa.[22] Then, turning back to the fan, he concluded as follows:

> There is melted and resolidified metal in the area of the lamp holders. There is melted and resolidified copper on the wiring in the area of the switches that resulted from arcing. There is damage to the motor windings which lessens as distance increases from the laminated core. Insulation of wiring that is compromised and allows current to flow in unintended paths results in arcing. Arcing is a well known cause of fires. Motor windings increase in temperature when current flows through them. Increasing mechanical load due to circumstances including bearing failure can cause windings to overheat. Overheated motor windings can cause temperatures to rise to the point of igniting nearby materials. Overheated or burning parts from a ceiling fan/light can ignite things that they fall upon. The evidence of the ceiling fan/light is consistent with being a cause of a fire. The ceiling fan/light could not be ruled out as a cause of the fire.

> Mr. Jones ruled out the ceiling fan/light as a cause before it was thoroughly examined. He determined what he considered to be separate origins of fires. All of the points he determined to be origins are within the same building space. Burning embers from a smoldering fire can become airborne and fall upon other fuels and ignite them. With no walls between the points Mr. Jones considers origins, there is nothing to prevent the burning debris from spreading the fire to additional points that are disconnected. The

---

[20] See Exhibit A, pages 19-20.
[21] See Exhibit A, pages 25-28.
[22] See Exhibit A, page 29.

evidence of burned debris in numerous places in the house shows that burning.[23]

Mr. Ebersole, citing NFPA 921, § 22.2.1, pointed out that it is well-known that fire that spreads can appear to have multiple origins, when in fact it only has one origin. Mr. Ebersole then criticized Mr. Jones, who failed to "provide any basis for how he determined that the fires he considered to be separate weren't the outgrowth of the initial fire," and "ruled out the fan/light as a cause before it was thoroughly examined and before the evidence of arcing and localized heating was uncovered."[24]

Mr. Ebersole concluded by pointing out that it is well-known in fire investigation that "until an acceptable level of certainty can be proven, the proper classification of the cause is undetermined." Indeed, as Mr. Ebersole pointed out, NFPA 921, § 19.2.1.4 provides that "[w]henever the cause cannot be proven to an acceptable level of certainty, the proper classification is undetermined."[25] Mr. Ebersole ultimately opined that the ceiling fan could not be ruled out as a cause of the fire, and Mr. Jones "should have ruled the cause of this fire as undetermined."[26]

### III.

The Plaintiffs also retained Joseph E. Myers, Sr. to respond to Mr. Jones' findings.

At the outset of his report, Mr. Myers made clear that he had employed "the scientific method as recommended by National Fire Protection Association 921, 2001 Edition, Guide for Fire & Explosion Investigations."[27]

---

[23] See Exhibit A, page 29.
[24] See Exhibit A, page 30.
[25] See Exhibit A, page 30.
[26] See Exhibit A, page 30.
[27] See Exhibit C, page 2.

After setting forth details of his site examination, Mr. Myers criticized Mr. Jones' conclusion – which Mr. Jones reached without properly examining the fan – that the fan showed no evidence of malfunction or electrical activity.   Mr. Myers pointed out that the evidence of electrical activity that Mr. Ebersole found on the windings of the motor suggest that the fan suffered an electrical malfunction, and one certainly could not eliminate the fan as an ignition source, as Mr. Jones did, without a thorough examination of the motor windings.[28]

Mr. Myers further criticized Mr. Jones' conclusion that there were three separate, uncommunicative fires in the living room.   Mr. Myers pointed out that the burn patterns on the wing of the leather chair are on the side facing the sofa, and there is little or no damage on the opposite side of the chair.   He further pointed out that the wood framework of the love seat facing the couch was totally consumed, while the opposite end shows far less damage.   He opined that, if a separate fire had originated on the cushion of the leather chair, or the love seat, the damage would be equal across the surface of those pieces of furniture.   Thus, the fire traveled from the couch, on which the fan had fallen, which was "consistent with one origin: the center couch, below the fan/light."[29]   In support of his analysis, Mr. Myers cited "The Ignition Handbook" by Vytenis Babrauskas, who holds a Ph.D. in fire protection engineering.[30]

After further analyzing the matter, Mr. Myers concluded as follows:

> After conducting a thorough and systematic examination of the fire scene, reviewing photos of Fire Investigator Thomas Jones, together with participating in the destructive examination of the fan/light and findings of Daryl Ebersole P.E., it is the opinion of this investigator that this fire originated on the center sofa below the fan/light.   According to Daryl Ebersole P.E., electrical activity was found on windings of the fan/light and no other physical evidence of arcing was found on the house wiring or on the fan/light which could be attributed to attack by fire.   The fan/light

---

[28] See Exhibit C, pages 6-7.
[29] See Exhibit C, page 7.
[30] See http://www.doctorfire.com/VBabrauskas.pdf.

cannot be ruled out as a possible ignition source which caused the fire.  In addition, the effects of radiant heat cannot be ruled out as the cause of fire spread to the other couch and chair in the living room.  It is the opinion of this investigator, that the cause of this fire is "undetermined".[31]

---

[31] See Exhibit C, page 10.

## COUNTER-STATEMENT OF QUESTION PRESENTED

**Question:** Does the Proposed Testimony of Messrs. Ebersole and Myers "Lack Sufficient Certainty," as Claimed by Nationwide?

**Proposed Answer:**   No.

## LEGAL ARGUMENT

**1.    NFPA 921, Which Mr. Ebersole Relied Upon in Reaching His Conclusions, is Reliable as a Matter of Law**

Federal Rule of Evidence 702 sets forth the parameters for the admissibility of expert testimony in federal courts.  That rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In <u>Daubert v. Merrell Dow Pharmaceuticals</u> and <u>Kumho Tire Co. v. Carmichael</u>, the United States Supreme Court has occasion to interpret Federal Rule of Evidence 702 and held that, regardless of an expert's area of expertise, Rule 702 requires the District Court to fulfill a "gatekeeping" function.[32]  According to the Supreme Court, this function extends to determining the issues of "qualification, reliability and fit."[33]

With regard to reliability, proposed expert testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[34]  This entails a preliminary assessment of whether "the reasoning or methodology underlying the

---

[32] See <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993); <u>accord</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999).

[33] See <u>Schneider v. Fried</u>, 320 F.3d 396, 401 (3d Cir. 2003).

[34] See <u>id.</u> (quoting <u>Daubert</u>, 509 U.S. at 590); <u>accord</u> <u>Keller v. Feasterville Family Health Care Ctr.</u>, 557 F. Supp. 2d 671, 675 (E.D.Pa. 2008).

testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue."[35]

As previously stated, NFPA 921 is the universally accepted standard for investigating a fire's cause and origin.[36]   Numerous courts, including this one, have held that NFPA 921 is reliable for purposes of Federal Rule of Evidence 702.[37]

In its Motion to Exclude, Nationwide principally argues that Mr. Ebersole's conclusion that the fire was "undetermined" is "contrary to the purpose of Daubert." This argument lacks merit.  As Mr. Ebersole pointed out in his initial report, NFPA 921, § 19.2.1.4 provides that "[w]henever the cause cannot be proven to an acceptable level of certainty, the proper classification is undetermined."[38]   Mr. Ebersole ultimately opined that the cause of the fire should be classified as undetermined.[39]   There is absolutely nothing unscientific or unreliable about this conclusion.  To the contrary, it is based upon a methodology that this court, and numerous other federal courts considering the issue, have found to be reliable.

Indeed, NFPA 921, § 2.1 provides that "[w]ith few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together."  NFPA 921, § 2.2 in turn provides that "[t]he systematic approach recommended" in determining the origin and cause of a fire "is that of the scientific method, which is used in the physical sciences. This method provides for the organizational and analytical process desirable and necessary in a successful fire investigation."  Finally, NFPA 921, § 19.2.1.4 provides that "[w]henever the cause cannot be proven to an acceptable level of

---

[35] See Daubert, 509 U.S. at 592-93.
[36] See, e.g., Hebshie, 754 F. Supp. 2d at 109 n.39.
[37] See Hoang, 652 F. Supp. 2d at 567.
[38] See Exhibit A, page 30.
[39] See Exhibit A, page 30.

certainty, the proper classification is undetermined." Here, the Plaintiffs' experts determined the origin, and further determined that the cause cannot be proven to an acceptable level of certainty, which mandates a classification of "undetermined." Nationwide's unsupported argument to the contrary simply cannot withstand scrutiny.

Nationwide's counsel next argues that Mr. Ebersole should have done a laundry list of things (such as "reference any maximum line load levels for the type of fan involved"). Any party can claim that an opposing expert failed to do something; that does not mean that the exposing expert was required to do that thing. As previously stated, Mr. Ebersole followed a standard that has repeatedly been determined to be reliable. In this first-party action, Mr. Ebersole is not required to definitively prove that the fan caused the fire.

Finally, Nationwide's counsel argues that Mr. Ebersole's conclusion that "[b]urning embers from a smoldering fire can become airborne and fall upon other fuels and ignite them" is speculative. This argument reads like a rough-drafted cross examination, and indeed this argument goes to the weight of the evidence as opposed to its admissibility.

Indeed, in its briefing, Nationwide repeatedly fails to acknowledge that it bears the burden of proving its bold accusation that the fire was intentionally set by Mr. McKean. Mr. Andress concluded, after spending forty minutes with a flashlight, that there were five origins, and the cause of the fire was arson. Nationwide's fire investigator Mr. Jones parroted Mr. Andress' conclusions as to cause and origin and summarily dismissed the obvious possibility that the fan found on the couch was the cause of the fire.[40] And Nationwide's engineer Sidney Rubin concluded in his December 28, 2013 Report ("Rubin Report") that the fan did not cause the fire without citing any scientific standards beyond one basic standard set forth in NFPA 921.[41]

---

[40] See Exhibit F.
[41] See Rubin Report, a true and correct copy of which is attached as **Exhibit "G."**

The Plaintiffs have every right to meet the allegations of these experts through expert testimony based upon NFPA 921 and point out that those individuals should have listed the cause as undetermined.   The Plaintiffs are not obligated, as Nationwide's counsel seems to suggest, to definitively prove that the fan caused the fire.  NFPA 921, § 19.2.1.4 makes clear that there are times when "the cause cannot be proven to an acceptable level of certainty," and "the proper classification" of such fires is "undetermined."

Mr. Ebersole, sedulously applying NFPA 921's methodology, concluded as follows:

- The heaviest burning occurred in the area of the living room that included the ceiling fan and the couch, and thus the origin of the fire was the area of the ceiling fan and the couch.

- An examination of the fan revealed (a) melted and resolidified metal in the area of the lamp holders; (b) melted and resolidified copper, resulting from arcing, on the wiring in the area of the switches; and (c) damage to the motor windings.

- This is consistent with the fan causing the fire.

- "There is no interior wall to separate the kitchen from the living room." and "[t]he kitchen, living room, and dining room on the first floor are all one open space with stairways ascending to the second floor."

- All of the five "separate origins" identified by Mr. Andress and Mr. Jones are "within this open space," and there was "nothing to inhibit flying brands, heat, hot gases, and drop down burning debris from migrating through the space."

- "Separate fires" can all share a single origin such as the fan, where the fire spreads by conduction, convention, or radiation, flying brands, direct flame impingement, and falling flaming materials.

-15-

- "The markings on the wall above the burned rag or towel show that movement was occurring from the area of the burning living room furniture toward the kitchen area. … The locations where burning debris falls can result in them igniting remote fuels which can appear to be different origins."

- "The presence of burned paper on the kitchen counter, the charred rag or towel, and the nearby furniture are all consistent with being [the] outgrowth of a fire that originated at a single location in the living area."

Mr. Ebersole ultimately concluded that, because the fan could not be ruled out as a cause of the fire, Mr. Jones "should have ruled the cause of this fire as undetermined."[42]  Nationwide's disagreement provides no basis to exclude this conclusion.

Finally, in a footnote, Nationwide points this Court to an unpublished decision, Saitta v. Franklin Development Company, wherein Mr. Ebersole's testimony was excluded.  Saitta is highly distinguishable.

In Saitta, plaintiff Charles Saitta, who was an electrician, was working on an electrical panel.  As he began his work, Mr. Saitta believed it was necessary to "unfix" a ground cable that had allegedly been installed by an employee of Norsemen Company Mechanical and Electrical Contractors, Inc. ("Norsemen").  During the process, the ground cable dropped approximately one inch and then the panel exploded, which caused Mr. Saitta to sustain injuries.  Mr. Saitta brought a tort action against Norsemen.  Mr. Ebersole was retained by Mr. Saitta and testified at trial.[43]

---

[42] See Exhibit A, page 30.
[43] See generally Saitta v. Franklin Development Co., Docket No. A-2466-06T1, 2009 N.J. Super. Unpub. LEXIS 241 (N.J. Super. App. February 13, 2009).  A copy of this opinion is attached to Nationwide's Motion to Exclude as Exhibit "D."

After Mr. Ebersole testified, the defendants moved to exclude his testimony under New Jersey's "net opinion" rule, which provides that an expert's opinion must be supported by factual evidence in the record. The defendants did not attack Mr. Ebersole's qualifications or even methodology; rather, they argued that Mr. Ebersole's opinions were "net opinions" because the plaintiff had failed to adduce proof that the ground cable that allegedly caused the fire "had ever been moved, over-bent or compromised" by an employee or agent of Norsemen. Nothing in Saitta suggests for one moment that the methodology employed by Mr. Ebersole in this case is scientifically unsound.

### 2.     Mr. Myers' Opinions are Equally Reliable

As set forth above, Mr. Myers expressly based his opinions on NFPA 921, and also relied upon "The Ignition Handbook" by Vytenis Babrauskas, who holds a Ph.D. in fire protection engineering, and ATSM 1188-11.

Much of Nationwide's attempted attack on Mr. Myers again reads like a cross-examination. For example, Nationwide does not attack on methodological grounds Mr. Myers' conclusion that "the wood framework closest to the center couch" being totally consumed is "consistent with one origin: the center couch, below the fan/light." Rather, Nationwide states, "It is also equally wholly consistent with an intentionally set fire on the sofa." At the very best for Nationwide, this is a cross-examination question to which Mr. McKean can respond.

Knowing that it cannot attack NFPA 921, Nationwide then states that it is unsure whether "The Ignition Handbook" is subject to peer review. To be clear, "The Ignition Handbook" is indeed a peer-reviewed publication published by the Society of Fire Protection Engineers.

Nationwide then takes issue with Mr. Myers' statement that the "ignition source for the one sofa and chair most likely come from one source; the sofa below the fan/light, and are the results of radiant heat and cannot be ruled out as such," and Mr. Myers' statement that it cannot

be ruled out that the fire spread into the kitchen once a window failed, and led to more rapid fire growth.  In Nationwide's view, "Meyers [sic] is careful to avoid saying that the ignition source was the ceiling fan," and is speculating.

Nationwide's argument twists the burden of proof around.  Both Mr. Myers and Mr. Ebersole, applying NFPA 921, have determined to a reasonable degree of professional certainty that the cause of the fire cannot be proved with sufficient certainty and therefore should have been listed as undetermined.  This is not a products liability case.  By purchasing homeowner's insurance, insureds eliminate any obligation to prove a case against a manufacturer whose product causes a fire, a task that can sometimes be difficult. Unless Nationwide can somehow prove that the fire was intentionally set, it owes the Plaintiffs coverage.

Finally, Nationwide takes issue with Mr. Myers' reference to Mr. Ebersole's conclusions. This Court need not labor long on this argument.  Under Federal Rule of Evidence 703, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Thus, Rule 703 allows Mr. Myers to refer to Mr. Ebersole's conclusions.

## **CONCLUSION**

For the foregoing reasons, the Motion to Exclude should be denied in its entirety.

Dated: <u>Wednesday, April 30, 2014</u>  Respectfully submitted,

           SHERMAN, SILVERSTEIN, KOHL,
           ROSE & PODOLSKY, P.A.

   By: /s/ Jeffrey P. Resnick
       Jeffrey P. Resnick
       308 Harper Drive, Suite 200
       Moorestown, NJ 08057
       Telephone: 856-662-0700
       Facsimile: 856-488-4744
       jresnick@shermansilverstein.com

       *Attorneys for Plaintiffs Stephen McKean and*
       *Michele McKean*